# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

JENNIFER HEATH BOX,                          )
                                             )
                    *Plaintiff,*             )
                                             )
            v.                               )
                                             )
BROWARD COUNTY, FLORIDA;                     )
                                             )
BROWARD COUNTY SHERIFF'S DEPUTY              )        Case No. _____
    PETER PERAZA;                            )
                                             )        **COMPLAINT & JURY DEMAND**
BROWARD COUNTY SHERIFF'S DEPUTY              )
    MONICA JEAN;                             )
                                             )
BROWARD COUNTY BOOKING OFFICER,              )
    JANE DOE (BSO ID No. BS15913);           )
                                             )
BROWARD COUNTY CORRECTIONS SPECIALIST,       )
    (First Name Unknown) THORPE;             )
                                             )
BROWARD COUNTY CORRECTIONS OFFICER,          )
    JOHN DOE;                                )
                                             )
                    *Defendants.*            )
_____ )

## INTRODUCTION

1.      Officers with the Broward County Sheriff's Office arrested Jennifer Heath Box on someone else's warrant because they overlooked overwhelming evidence that they had the wrong person.  There were over a dozen reasons why BSO officers should have realized that Jennifer wasn't wanted for child endangerment in Harris County, Texas.  But they ignored each one and forced Jennifer to spend three days in jail, away from her family over Christmas.

2.      Jennifer has never been in trouble with the law.  Her three kids are all grown and out of the house—she had no minor children to endanger when Harris County issued a warrant for Jennifer Delcarmen Heath.  It should have been obvious that Jennifer Heath Box was not subject to the warrant: Jennifer and the suspect had different maiden names, different married names, and different birthdates; Jennifer was nearly twice the suspect's age and five inches taller; they had different color hair, different color eyes, and different skin tones; they had different tattoos; they lived in different counties; they had different driver's license numbers, different social security numbers, and different FBI numbers.

3.      Everything BSO officers needed to tell the two women apart was readily available to them before they decided to board a cruise ship on Christmas Eve to arrest the wrong Jennifer Heath.  Add that to the fact that Jennifer had no minor children, and that there were no warrants attached to her license, and there's really no excuse.

4.      From BSO's first reckless mistake up until Jennifer's eventual release, officers failed to employ the reasonable procedures and basic diligence we should expect from law enforcement.  They ignored a series of red flags and put Jennifer in jail without ever

verifying that she was wanted in Texas.  So, instead of spending Christmas with her family and seeing off her son for his three-year tour with the Marines, Jennifer had to endure the horrible conditions in Broward County's jails for three long days.  Guards demeaned Jennifer, searched her body cavity, watched her shower, and blasted death metal and freezing air into her cell all day and night.

5.      It took 75 hours and the tireless work of Jennifer's family to finally convince BSO that they had the wrong person.  And even when BSO officials finally admitted that they locked up the wrong person, they *still* kept Jennifer in jail another day.  They told Jennifer that she had to stay behind bars until Harris County either arrested the correct Jennifer Heath or came to Broward County to extradite the wrong one.

6.      What Broward County did to Jennifer is well outside the bounds of what the Constitution demands.  Any reasonable person would have stopped at the giant red flags along the way.  The Fourth Amendment to the United States Constitution protects against unreasonable detentions, and the Due Process Clause protects against arbitrary deprivations of liberty.  When police ignore obvious evidence that they have the wrong person and put them in jail anyway, they violate both these constitutional guarantees.  This lawsuit seeks accountability for those who put Jennifer through this nightmare.

## PARTIES

7.      Plaintiff Jennifer Heath Box is a U.S. citizen who currently resides in Harris County, Texas.  She's a 50-year-old mother of three adult children.  She has no criminal record and there's never been a warrant for her arrest.  When the Broward County Sheriff's

Office mistakenly arrested Jennifer on a warrant for someone half her age, she was in Broward County, Florida, returning from a cruise with her family.

8.     Defendant Broward County is a county in Florida that contains Port Everglades, the Broward County Jail, and the Paul Rein Detention Center, where Jennifer was arrested, booked, and detained unlawfully.  The Broward County Sheriff's Office is a department of the county government and is responsible for law enforcement within the county and operating the county's jails.  At all times relevant to this case, Broward County, the Broward County Sheriff's Office, its officers, agents, and employees acted under color of law.  The actions that give rise to Jennifer's claims are, unless otherwise indicated, committed pursuant to the policies, practices, and customs of Broward County, and at the direction of, with the knowledge of, and through the actions of its former and current policymakers.

9.     Defendant Peter Peraza is a deputy with the Broward County Sheriff's Office. Deputy Peraza led the team that boarded a cruise ship to arrest Jennifer despite obvious evidence that Jennifer was not the subject of the arrest warrant.  In addition to that obvious evidence, Deputy Peraza lied and said that Jennifer's identifying information matched that on the warrant.  Deputy Peraza is sued in his individual capacity.

10.    Defendant Monica Jean is a deputy with the Broward County Sheriff's Office. Deputy Jean partnered with Deputy Peraza on the team that boarded a cruise ship and arrested Jennifer despite obvious evidence that Jennifer was not the subject of an arrest warrant.  Deputy Jean is sued in her individual capacity.

11.     Defendant Jane Doe is a booking officer with the Broward County Sheriff's Office.  Deputy Doe processed Jennifer's booking at the Broward County Jail even though Jennifer's license showed that there were no warrants for her arrest and Jennifer's identifying information did not match that of the suspect.  Although Jennifer does not know Deputy Doe's name, she believes that Deputy Doe's BSO ID number is bs15913.  Deputy Doe is sued in her individual capacity.

12.     Defendant (First Name Unknown) Thorpe is believed to be a booking specialist with the Broward County Sheriff's Office.  Specialist FNU Thorpe had several phone calls in which Jennifer's brother explained that BSO had the wrong person, but Specialist Thorpe refused to verify Jennifer's identity while Jennifer spent Christmas in jail.  Although Jennifer does not know Specialist Thorpe's first name, she believes that Specialist Thorpe works at the Broward County Jail.  Specialist Thorpe is sued in his individual capacity.

13.     Defendant John Doe is a corrections officer with the Broward County Sheriff's Office.  Officer Doe came to Jennifer's cell on December 26 to let Jennifer know that BSO knew she was not the subject of the arrest warrant but that BSO was going to make Jennifer stay in jail anyway until Harris County came to get her or arrested the correct Jennifer.  Officer Doe is sued in his individual capacity.

## JURISDICTION AND VENUE

14.     Plaintiff brings this civil-rights lawsuit pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-02 to declare and remedy violations of rights, privileges, or immunities secured by the United States Constitution.

15.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

16.     Venue is proper in this Court under 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### Jennifer Took a Cruise to Celebrate Her Brother Beating Cancer

17.     Jennifer Heath Box lives in Richmond, Texas, with her husband, Kyle Box. She works as a Senior Financial Systems Administrator.

18.     Jennifer's three adult children are all out of the house by now.  Her two daughters live elsewhere in Texas, and her son is on a three-year deployment in Japan with the U.S. Marines.

19.     Back in 2022, Jennifer lived in Fort Bend County, Texas, where she lived from 2013 until 2024.

20.     In January 2022, Jennifer's brother Mark was diagnosed with seminoma cancer for a second time.  Once doctors confirmed that his treatment was successful and he was fit to travel, Mark invited Jennifer and Kyle on a cruise to celebrate his health and other milestones that passed while he was in treatment.

21.     Jennifer and Kyle met Mark, his wife—also named Jennifer Heath—and their children in Fort Lauderdale on December 18, 2022.

22.     The cruise left from Port Everglades on December 18 and returned on December 24.

23.     Jennifer was elated to have this time with her husband and her brother's family, after which she planned to promptly return home to Texas, so she could spend Christmas with her children.

24.     That Christmas was going to be the last time for at least three years that Jennifer would have all three of her children together.

25.     Jennifer's son, Joshua, had just completed training with the Marines and was set to be deployed to Japan for three years on December 27, 2022.  So, just after Christmas in Texas, Joshua had to fly to Seattle to leave for his deployment.

26.     But unbeknownst to Jennifer, while she and her family were enjoying their celebratory cruise, the Broward County Sheriff's Office was planning to arrest her for someone else's crime.

**BSO Deputies Plan to Arrest Jennifer Without Verifying Her Identity**

27.     When Jennifer's cruise ship arrived back at Port Everglades early on the morning of Christmas Eve, she and her family began to disembark around 6:00 a.m.

28.     A team of BSO officers, with the help of U.S. Customs and Border Patrol, were waiting to arrest her before she could get off the ship.

29.     Officers discovered when Jennifer left on the cruise that someone named Jennifer Heath had an outstanding warrant in Texas for endangering a dependent child under the age of 15 in July 2022.

30.     Although Jennifer's maiden name is Jennifer Heath and her sister-in-law's married name is also Jennifer Heath, neither of them were the person wanted in Texas, as neither of them had minor children there.

31.     All the information that officers needed to verify that Jennifer was not the subject of the warrant was readily available to them before they decided to board the cruise ship.

6

32.     BSO had six days to figure out that Jennifer Heath Box was not the subject of a warrant out of Texas, but they did not take the reasonable steps necessary to resolve the issue before they decided to arrest the wrong Jennifer.

33.     Between the information on the warrant and information available in the National Crime Information Center database, BSO officers should have been able to readily identify at least 10 discrepancies between Jennifer and the subject of the Harris County warrant:

a.  The warrant was for Jennifer Delcarmen Heath, while Jennifer's name is Jennifer Heath Box.  Heath is Jennifer's maiden (now middle) name—not her surname.

b.  Delcarmen Heath's birthdate was April 7, 1997, while Jennifer's date of birth is January 28, 1974, making her 23 years older than the subject of the warrant.

c.  Delcarmen Heath's address was an apartment on Corder Street in Houston, Texas, while Jennifer's address was in a different county, on Blue Pearl Drive in Richmond, Texas, where she had lived for the prior nine years.

d.  Delcarmen Heath had a Texas driver's license number ending in 819, while Jennifer's driver's license number ends in 610.

e.  Delcarmen Heath had a different social security number than Jennifer.

f.  Delcarmen Heath had a different FBI number than Jennifer.

g.  Delcarmen Heath had brown eyes while Jennifer's eyes are blue-gray.

h.  Delcarmen Heath was 4'11" while Jennifer is 5'4".

i.   Delcarmen Heath had medium-toned skin while Jennifer's skin is fair.

j.   Delcarmen Heath had black hair while Jennifer's hair is red.

34.   These 10 discrepancies between Jennifer and Delcarmen Heath should have caused any reasonable officer to realize that the warrant was not for Jennifer.

35.   At the very least, these 10 discrepancies would have caused any reasonable officer to do basic due diligence to confirm whether the person they planned to arrest was actually subject to the arrest warrant.

36.   It should have been easy for BSO to confirm its error because the warrant sought Jennifer Delcarmen Heath's arrest for endangering two dependent children under 15—her toddlers, ages one and three—while Jennifer's children were all adults—ages 29, 20, and 18—when the warrant issued.  In fact, Jennifer's oldest daughter is older than the subject of the warrant.

37.   The complainant in Delcarmen Heath's case was her husband, Christopher Heath.  Jennifer's husband is Kyle Box.

38.   Jennifer also had a different Harris County System Person Number than Delcarmen Heath, something BSO could have confirmed by contacting Harris County.

39.   But over the course of Jennifer's six-day cruise, no one at BSO bothered to check any of these basic details before assembling a team and boarding a cruise ship on Christmas Eve to arrest the wrong Jennifer Heath.

**BSO Deputies Arrest Jennifer Without Verifying Her Identity**

40.   When Jennifer scanned her ID to exit the ship just before 6:30 a.m., an alert signaled, and ship security immediately removed her from the line.

41.     About eight police officers quickly surrounded Jennifer and her husband.

42.     When Jennifer asked why she was being detained, BSO deputies just told her it was "for a warrant."

43.     Jennifer asked what the warrant was for, and BSO Deputy Peraza responded that it was from Harris County, Texas, for "endangering a child" (specifically, endangering a dependent child under the age of 15).

44.     Jennifer was confused given that she had no minor children.

45.     Jennifer had never been arrested, and she had no outstanding warrants.

46.     Kyle immediately said, "I think you have the wrong person."  And Deputy Jean responded, "That's why we verify."

47.     But Deputy Peraza had already made up his mind to arrest Jennifer, stating, "We have to verify, but we're already at this point, so …"

48.     Deputy Peraza then asked Jennifer her age, and she told him her date of birth was January 28, 1974.

49.     Even if BSO had not bothered to compare Jennifer's information to the warrant before boarding the ship, Jennifer telling Deputy Peraza her birthdate should have been a giant red flag: The warrant sought someone nearly half Jennifer's age.

50.     Jennifer also handed officers her driver's license and passport, both of which contained plenty of information to alert the officers that she was not the subject of the warrant.

51.     Additionally, as Jennifer pointed out to officers, it was impossible for the warrant to be for her because her children were grown and in college.

52.     Deputy Jean responded, "Like I said, that's why we verify."

53.     At that point, officers began passing around a copy of the warrant to review the suspect's information.

54.     Just looking at Jennifer should have caused any reasonable officer on the scene to realize that Jennifer was not Delcarmen Heath.   There were at least five observable differences between Jennifer and the woman police were trying to arrest:

a.  Jennifer was 48 years old while the warrant sought someone who was 27 years old—nearly half Jennifer's age.

b.  Jennifer is five inches taller than the suspect.

c.  Jennifer has fair skin while the warrant sought someone with medium-toned skin.

d.  Jennifer has light blue-gray eyes while the warrant sought someone with brown eyes.

e.  Jennifer has red hair while the warrant sought someone with black hair.

55.     But BSO officers ignored these observable facts in addition to the differences in identifying information that they ignored before boarding the ship.

56.     Deputy Peraza insisted that the team arrest Jennifer anyway.

57.     Officers ordered Jennifer to remove her jewelry, give her belongings over to her husband, and turn over her phone to police.

58.     Deputy Peraza then handcuffed Jennifer in front of her husband and onlooking passengers.

59.     Kyle could do nothing but watch on helplessly as police insisted that they would make sure they had the right person but only after they arrested his wife on Christmas Eve.

60.     As Deputies Peraza and Jean handcuffed Jennifer and led her to a service elevator, Jennifer insisted again that they had the wrong person because she has no minor children to endanger.  And Deputy Jean assured her again, "Well, that's why we verify."

61.     The officers would not, however, verify they had the right person.

62.     Instead, officers escorted her from the cruise ship, patted her down, and placed her in the back of Deputy Peraza's police cruiser.

63.     There was no urgent need for officers to arrest Jennifer *before* verifying that she was the subject of the warrant.  She was cooperative and, had police heeded the many signs they were wrong, they could have discovered their obvious error in a matter of minutes.

## BSO Deputies Continue to Ignore Basic Facts as
## They Arrest the Wrong Jennifer

64.     Despite the officers' assurances that they would "verify" that Jennifer was the subject of the warrant, no officer did so.

65.     BSO found the wrong Jennifer through a superficial search that revealed she shared two-thirds of her name with a suspect from Houston.  They then disregarded mounting evidence that the Jennifer Heath Box on the cruise ship was not the much younger Jennifer Delcarmen Heath.

66.     While Deputy Jean put Jennifer in the back of Deputy Peraza's vehicle, Deputy Peraza looked at Jennifer's license again and compared her information to the suspect's information on the warrant.

67.     After staring at the documents for about 10 seconds, Deputy Peraza opened his squad car to ask Jennifer her name again.

68.     When Jennifer told Deputy Peraza that Heath is her middle name—not her surname—Deputy Peraza hesitated for the first time.

69.     He stared at the warrant information for another 10 seconds in silence as he slowly closed the squad-car door to lock Jennifer in the backseat.

70.     Deputy Peraza re-read the warrant information one more time before telling Deputy Jean that they should proceed with Jennifer's arrest.

71.     Deputy Peraza then got into his cruiser and looked up Jennifer's information on his computer—or at least he went through the motions.

72.     He then told the other officers they could leave because it was an "extraditable warrant," so he saw no reason to let Jennifer go unless "if by some weird coincidence, they weren't able to confirm the warrant."

73.     Detective Peraza asked Jennifer for her eye color (blue) and remarked that her skin tone was "fair," as he continued to ignore that those characteristics, and others, did not match the suspect's description.

74.     There was no pressing need to rush Jennifer's arrest *before* officers made sure they had the right person.  The officers detained Jennifer in a secluded parking lot at

the port in the early hours of Christmas Eve.  They had ample time and opportunity to do basic due diligence.

75.    But Deputy Peraza drove Jennifer away from the port without confirming her identity.

76.    Jennifer remained calm and cooperative, but she continued to explain that officers had the wrong person.

77.    As Deputy Peraza drove, Jennifer pointed out that she was not even the only Jennifer Heath on her cruise.

78.    Deputy Peraza seemed confused by the idea that there might be more than one Jennifer Heath.

79.    Jennifer thought she had finally broken through to him.

80.    But Deputy Peraza lied and said that the information on the warrant matched her date of birth and her married name (Box).

81.    Deputy Peraza then stopped his cruiser somewhere and reviewed the warrant information again.

82.    Jennifer sat handcuffed in the back of Deputy Peraza's car as he worked on his computer.

83.    As already set out above, the differences between Jennifer and the subject of the warrant were readily apparent to anyone willing to look.  And Deputy Peraza also had the benefit of Jennifer pointing out several of these differences throughout her arrest.

84.    Rather than make sure he was arresting the right person, however, Deputy Peraza complained to Deputy Jean as they sat parked, "What are they so worried about?

13

I mean, I … we already know the little clues here, hints … and I tell them beforehand, I literally tell them beforehand if I know I'm going to make an arrest."

85.    Deputy Peraza then told Deputy Jean that Jennifer's identity is "confirmed."

86.    He did not, in fact, confirm Jennifer's identity.

87.    In addition to overlooking the physical and biographical indicia that he had the wrong person, Deputy Peraza did not contact anyone in Harris County to verify that Jennifer was the subject of the warrant or that Harris County wanted Broward County to detain Jennifer Heath Box for extradition.  Nor did he contact dispatch to ask them to do so.

88.    There was no legitimate process or basis by which Deputy Peraza "confirmed" that Jennifer was the subject of the Texas warrant.

89.    On information and belief, Broward County has no policy in place requiring officers to take additional steps to confirm an arrestee's identity when there is reason to believe they are executing an arrest warrant on the wrong person.

90.    Deputy Peraza began driving again.  As they approached the jail, Jennifer asked when the warrant was issued.

91.    When Deputy Peraza said July 2022, Jennifer told him that she's been pulled over in Texas since July 2022, and police did not find any warrants for her arrest.

92.    Jennifer reiterated that her children were adults by July 2022, with her youngest turning 18 that January.

93.    The warrant wanted someone for endangering a child in their custody under the age of 15.  That person could not have been Jennifer.

94.     While this information should have, once again, caused any reasonable officer to stop the arrest, it only caused Deputy Peraza to muse about whether Jennifer was wanted in Texas for something having to do with her divorce.  He asked Jennifer about her ex-husband and past child support payments—none of which had anything to do with child endangerment.

95.     Ignoring every indication that he arrested the wrong person, Deputy Peraza brought Jennifer into the booking station at the Broward County Jail.

**While Booking Jennifer, BSO Officers Ignore More Giant Red Flags**

96.     When BSO officers booked Jennifer, Defendant Jane Doe[1] scanned Jennifer's driver's license and informed Deputy Peraza that there were no outstanding warrants attached to Jennifer's license.

97.     This news backed up what Jennifer told officers all along—that there was no warrant for her arrest, and they must have the wrong person.

98.     The fact that there was no warrant attached to Jennifer's license also would explain why police did not arrest Jennifer when she was pulled over in Texas after the warrant for Jennifer Delcarmen Heath issued.

99.     BSO officers once again ignored evidence that made clear they had the wrong Jennifer.

100.    Unable to admit his mistake, Deputy Peraza convinced Deputy Doe that she should also ignore all evidence negating probable cause.

---

[1] Although Jennifer does not know Defendant Jane Doe's identity at the time of filing this complaint, she reasonably believes that Jane Doe's BSO ID number is bs15913.  Jennifer will amend her complaint once she confirms Jane Doe's identity.

101.    All Deputy Peraza had to support his mistaken claim was that Jennifer shared two-thirds of her name with the suspect and, it turned out, the suspect's mugshot appeared to look like Jennifer.

102.    Yet rather than stopping the booking process to finally confirm if there was probable cause to detain Jennifer, Deputy Doe booked Jennifer anyway.

103.    On information and belief, BSO did not have a policy in place to require a booking officer to stop booking procedures when officers arrest someone on a warrant and their license shows they have no outstanding warrants.

104.    Had Deputy Doe stopped the booking procedures when Jennifer's license showed she had no warrant for her arrest, Defendants would have realized their mistake and released Jennifer before she spent any time in jail.

**BSO's Booking Documents Identify Jennifer with Information that Contradicts the Warrant**

105.    The forms that Deputies Peraza and Doe filled out to book Jennifer confirm that they had all the information they needed to realize they were detaining the wrong person.

106.    Deputy Peraza filled out an affidavit in support of Jennifer's arrest.  On that form, Deputy Peraza listed Jennifer's identifying information correctly—even though that information contradicted the description of Jennifer Delcarmen Heath, who was the subject of the Texas warrant.

107.    For instance, Deputy Peraza listed Jennifer's height as 5' 4", her eyes as blue, her skin as fair, her age as 48, her date of birth in 1974, and her local address as Richmond, Texas.

108.   None of this information matched Delcarmen Heath.

109.   Similarly, Deputy Doe filled out a booking form on which she listed Jennifer's height as 5' 4", her eyes as grey, her hair as red, her complexion as light, her age as 48, her date of birth in 1974, and her local address as Richmond, Texas.

110.   Again, none of this information matched Delcarmen Heath.

111.   Deputy Doe's booking report also identified two tattoos on Jennifer that were not listed in the warrant.

112.   The tattoos were yet another discrepancy between Jennifer and Delcarmen Heath.

113.   Deputy Doe booked Jennifer into the Broward County Jail anyway.

114.   A policy requiring booking officers to confirm that the identifying information on booking forms matches the suspect's identifying information would have prevented Deputy Jane Doe from mistakenly booking Jennifer into jail.

115.   But on information and belief, BSO has no policy requiring booking officers to confirm that the identifying information on booking forms matches a suspect's information, or stop the booking procedures when the information does not match.

116.   Had BSO policies required its officers to stop booking procedures when the information on booking forms does not match a suspect's information, Jennifer would not have had to spend any time in jail—let alone three long days over Christmas.

**BSO's Inadequate Booking Procedures Continue to Fail Jennifer**

117.   As part of the booking procedures, BSO officers also took Jennifer's fingerprints and mugshot.

118.   To state the obvious: Jennifer's fingerprints do not match Jennifer Delcarmen Heath's fingerprints—yet another difference between the two women's identifying information.

119.   On information and belief, BSO has no policy requiring officers to use an arrestee's fingerprints to confirm their identity before booking them into jail.  Nor do they have a policy requiring booking officers to run an arrestee's fingerprints after booking them in jail.

120.   Had BSO policies required its officers to use an arrestee's fingerprints to confirm their identity before booking them into jail, Jennifer would not have had to spend any time in jail—let alone three long days over Christmas.

121.   Yet, BSO not only failed to use Jennifer's fingerprints to confirm her identity before booking her into Broward County Jail, but they also failed to do so before she was arraigned and transferred out of central booking.

122.   BSO should have been aware of the risk its inadequate policies created given that at least two other victims of mistaken arrests in Broward County have alleged that their wrongful detainment could not have happened if BSO had used their fingerprints to confirm their identity as part of the booking process.

123.   In 2010, BSO arrested Paola Londono on someone else's warrant as she disembarked from a cruise ship with her nine-month-old son in her arms.

124.   Someone with the same name as Ms. Londono had an outstanding warrant for prostitution, heroin possession, and child abuse.  But the wanted Paola Londono had a different birthdate, was seven years older, five inches shorter, and 40 pounds heavier.

18

125.    Because BSO officers did not use Ms. Londono's fingerprints or her identifying information to confirm her claim of mistaken identity, officers did not catch their mistake during the booking process.

126.    BSO's lack of adequate policies to prevent mistaken detentions caused Ms. Londono to spend two days in jail until a judge in her hometown intervened.

127.    Following Ms. Londono's mistaken detention, BSO still failed to adopt adequate policies to prevent mistaken detainments.

128.    As a result of that failure, in January 2022, it happened again.

129.    Local police executed an arrest warrant on the wrong Leonardo Silva Oliverio.

130.    Mr. Oliverio had a different birthdate, did not have the suspect's tattoos, and weighed over 60 pounds less than the suspect.

131.    Yet, BSO booked him anyway because they did not use Mr. Oliverio's fingerprints or his other identifying information to confirm his claim of mistaken identity during the booking process.

132.    BSO mistakenly held Mr. Oliverio in jail for five days before they finally ran his fingerprints to confirm that he was the wrong person.

133.    Despite these similar past incidents, BSO still did not adopt common-sense policies requiring booking officers to verify an arrestee's identity during the booking process.

134.    Because BSO lacked adequate policies to protect innocent people from being mistaken for suspected criminals, and because Deputies Peraza, Jean, and Doe all ignored

the overwhelming evidence that Jennifer could not have been the subject of the Texas warrant, they booked Jennifer anyway.

135.    As they did, they told Jennifer she'd likely be spending her holidays in jail.

**Jennifer Endures a Traumatic Christmas in Jail**

136.    BSO officers booked Jennifer into jail on the evening of December 24, 2022.

137.    It was awful.  BSO officers made Jennifer strip off all her clothes and then conducted a search of Jennifer's body cavities.

138.    Officers then gave Jennifer a prison uniform and a blanket and placed her into a cell with other female inmates.

139.    Jennifer's confinement in jail was traumatizing.

140.    The guards were condescending and demeaning anytime Jennifer asked a question.

141.    Her first night in jail, Jennifer witnessed a fight in the adjoining men's area with continuous screaming, yelling, and violence.  She had to cover her ears to muffle the screaming.  Although she could see the guards watching on, they did not intervene for over half an hour.

142.    Guards kept the jail cells ridiculously cold.

143.    It was so cold that guards wore heavy coats, hats, and gloves.  The thin blanket that BSO gave Jennifer wasn't nearly enough to stay warm.

144.    Jennifer was forced to shiver all night while the guards wore coats, hats, and gloves.  She eventually lay back-to-back with a stranger just to try to keep warm.

145.    Between the fights, the screaming, the freezing temperatures, and the trauma of being jailed for someone else's crimes, Jennifer struggled to sleep.

146.    Jennifer showered daily to maintain her sanity and routine, but there was only a thin curtain between the shower and the guards, allowing the guards—both male and female—to watch her while in the shower.

147.    Jennifer woke up in jail on Christmas.

148.    The holiday, however, was not the reason for Jennifer's continued confinement, as Broward County's criminal procedures continued throughout the day.

149.    Indeed, Jennifer was arraigned by a local magistrate on Christmas.

150.    The problem for Jennifer was that the processes in place were not designed to figure out when someone was mistakenly arrested.

151.    Jennifer was not given the chance to consult with an attorney, to review the warrant and the charges against her, or to speak to the judge.

152.    The judge denied bond because the *other* Jennifer had an extradition warrant.

153.    After her arraignment, on the evening of Christmas, BSO officials transferred Jennifer to Broward County's Paul Rein Detention Center.

154.    By the time BSO transferred Jennifer out of Broward County Jail, its booking procedures—which, again, did not include verifying her identity—were complete.

155.    Before transferring her to the Paul Rein Detention Center, no officers at the Broward County Jail took any steps to verify that Jennifer's information or fingerprints

matched the subject of the warrant before they transferred her to the Paul Rein Detention Center to await extradition to Texas.

156.    Had they done so, they would have realized immediately that Jennifer was wrongfully detained.

157.    It was at this point that Jennifer realized she may not get to see her son Joshua before his deployment on December 27, which devastated her.  She still had no idea why she was in jail.

158.    Once at Paul Rein Detention Center, Jennifer faced more horrible conditions. Much like Broward County Jail, guards at Paul Rein kept the cells unreasonably cold.

159.    But the guards at Paul Rein also added a new form of psychological punishment: Guards blared death-metal music throughout the cells at all times of day and night.

160.    These conditions only worsened Jennifer's nightmare.

**Jennifer's Family Works to Correct BSO's Mistake**

161.    While Jennifer was detained, missing Christmas with her children before Joshua's deployment, her brother Mark and her husband Kyle were also away from their families.  The two men worked tirelessly to convince *anyone* at BSO to verify Jennifer's identity.

162.    Immediately after witnessing Jennifer's arrest, Kyle called his Jennifer's brother Mark, a law enforcement officer in Georgia.  Mark had gotten off the ship just before Jennifer's arrest.  He turned his car around immediately after hearing what happened and agreed to meet Kyle at the jail.

22

163.     Kyle and Mark arrived at the Broward County Jail shortly after Jennifer's arrest.  They waited in the jail lobby for several hours, while Mark's wife and children waited outside.

164.     The drive from Port Everglades to the Broward County Jail should have taken less than 15 minutes.  But Deputy Peraza stopped along the way as he pretended to "confirm" Jennifer's identity.

165.     When Mark and Kyle beat Jennifer to the station, they worried that something had happened to her while she was with Deputy Peraza.

166.     Another deputy eventually informed Kyle and Mark that Jennifer made it to the station and *was* the subject of the warrant.  The deputy told them that she would be booked into the Broward County Jail to await extradition to Texas after she could see a magistrate who would set or deny bond.

167.     That deputy was incorrect, of course.  Jennifer was not the subject of the warrant, but no one at BSO bothered to verify any basic facts to support their arrest.

168.     Mark and Kyle decided to stay in Florida, hundreds of miles away from their homes and the rest of their families on Christmas Eve, to wait and see if Jennifer would be granted bond, be released in time to spend Christmas with her family, and most importantly, see Joshua before his deployment.

169.     On Christmas Day, Kyle received a call from Jennifer letting him know that she had been denied bond.

170.    Upset, but determined to keep working for Jennifer's release, Kyle and Mark returned to Mark's home in Georgia to save money on hotels that they'd need to pay lawyers to get Jennifer out of jail.

171.    Jennifer called Kyle again on Christmas Day to let them know that she had been moved to the Paul Rein Detention Center to await extradition.

172.    After hiring an attorney in Texas to help, Mark and Kyle learned on December 26 that Jennifer Delcarmen Heath, who was born on April 7, 1997, resided in Houston, and was married to Christopher Heath, had run from the police.

173.    Deputy Covington with Harris County compared the warrant to Jennifer's records and noticed that Jennifer and Delcarmen Heath had different FBI numbers and different dates of birth.  Seeing just two discrepancies caused this officer to dig further.

174.    The officer quickly realized that someone with the Houston Police Department had mistakenly attached Jennifer's driver's license photo to the arrest warrant for Jennifer Delcarmen Heath.

175.    Both Mark and the attorney they hired started calling Harris County and Broward County to alert them to the mistake.

176.    Mark called several numbers in Broward County including the BSO Warrants Division, BSO Main Headquarters, and BSO Main Detention.  He finally spoke to someone believed to be Specialist NFU Thorpe[2] at the Broward County Jail.

---

[2] Although Jennifer does not know Defendant FNU Thorpe's full name or job title at the time of filing this complaint, she reasonably believes that FNU Thorpe works at the Broward County Jail as a booking specialist or in some similar role.  Jennifer will amend her complaint once she confirms FNU Thorpe's identity.

177.     Mark explained the situation to Specialist Thorpe, including the new evidence that Houston had attached the wrong DMV photo to Jennifer Delcarmen Heath's arrest warrant.

178.     In the face of more credible evidence that BSO was jailing the wrong person, Specialist Thorpe remained largely unhelpful.  Specialist Thorpe insisted it was *Jennifer's* responsibility to alert BSO of the issue—as if Jennifer had not been telling BSO deputies all along that they had the wrong person.

179.     Mark tried officials in Harris County, who explained that they needed BSO to send over the warrant and Jennifer's fingerprints, so that they could compare them to Delcarmen Heath's fingerprints.

180.     But when Mark called BSO again on the afternoon of December 26, Specialist Thorpe refused to contact Harris County or send them the information needed.

181.     Had Specialist Thorpe done so, Harris County would have confirmed that there was no warrant for Jennifer in time for her to see Joshua before he left.

182.     Mark and Kyle were understandably frustrated and upset at this point, because both jurisdictions had acknowledged the mistake, yet each wanted the other to fix it.

183.     Specialist Thorpe ignored Mark's pleas to contact Harris County, insisted it was Jennifer's job to get herself out of the jail cell in which she was wrongly imprisoned, and claimed there was no way BSO could fix its mistake.

184.   After about a dozen phone calls, on December 26, Specialist Thorpe finally relented.  Specialist Thorpe called Mark and told him that he would finally contact Harris County.  But neither Mark nor Kyle heard back from Deputy Thorpe that evening.

**BSO Admits It Has No Basis to Detain Jennifer but Keeps Her in Jail Anyway**

185.   Meanwhile, in jail, Jennifer was permitted two phone calls a day, which she used to communicate with her husband Kyle, who kept her up to date on his and Mark's efforts to get her free.

186.   On the afternoon of December 26, Kyle told Jennifer that Harris County acknowledged that Houston had placed her DMV photo on Delcarmen Heath's warrant.

187.   About an hour later, a jail official named Officer John Doe[3] came to Jennifer's cell and told her that BSO knew she was not the person wanted in Harris County.

188.   For a split second, Jennifer thought her nightmare was finally over.  But Officer Doe quickly crushed her hope.  He told her that, despite BSO's mistake, the only way for her to go free was if Harris County officials came to get her or arrested the right Jennifer Heath.

189.   Officer Doe told Jennifer that Harris County could take 30 days to come get her.

190.   And really, why would they come at all?

191.   Jennifer was devastated.

---

[3] Plaintiff does not know Officer John Doe's identity at the time of filing this complaint.  She reasonably believes, however, that Officer Doe is an official at Paul Rein Detention Center.  Plaintiff will amend her complaint to correctly identify Officer Doe after she discovers his real name.

192.    She asked to make a phone call, but Officer Doe told her she couldn't use the phone yet.

193.    About an hour later, Officer Doe came back to Jennifer's cell and permitted her to call Kyle again.

194.    Jennifer told Kyle that BSO acknowledged she was the wrong person and still wouldn't let her go until Harris County came to get her.

195.    Kyle told Jennifer that Specialist Thorpe suggested she file a complaint at the jail's kiosk.

196.    Around 8:30 that evening, Jennifer went to the kiosk and filed a complaint, asking BSO to compare her fingerprints to the suspect's fingerprints.

197.    By that point, BSO already acknowledged that they had the wrong Jennifer.

198.    BSO continued to hold Jennifer in custody for the remainder of December 26, into the morning of December 27, even though they now knew that she should not have been detained in the first place.

199.    As a result of BSO's reckless indifference to Jennifer's innocence, Jennifer was forced to endure another night of cold, uncomfortable, traumatizing conditions.

200.    Jennifer was finally released from custody at 9:50 a.m. on the morning of December 27, 2022, over 75 hours after her wrongful arrest.

201.    By the time BSO finally released Jennifer, it was too late to celebrate Christmas with her children, and worst of all, too late to say goodbye to Joshua before he left for his deployment.

202.    Jennifer tried to fly right to Seattle to see Joshua before he left, but due to a freeze in South Florida, she was unable to get a flight out.

203.    Jennifer and Kyle had to rent a car and drive across the state to fly out of Fort Myers.

204.    By that point, it was too late to see Joshua before he left.

205.    To this day, nearly two years later, Jennifer has still not had all three of her children together.

**Rather Than Admit Its Mistakes, BSO Confirms that Its Officers' Unreasonable Actions Were Consistent with Official Policy**

206.    Jennifer never got an apology or an explanation for why BSO mistook her for Jennifer Delcarmen Heath.

207.    When she was released, BSO personnel simply told her, "It happens."

208.    After Jennifer returned to Texas, she worked with the police there to disassociate herself from Jennifer Delcarmen Heath's warrant.

209.    Two officers with the Houston Police Department told Jennifer that had BSO called them at the time of arrest, they would have realized the error and told them not to detain her.

210.    But Broward County did not design its booking procedures to ensure that BSO puts the correct person in jail.

211.    Indeed, BSO has maintained publicly that Deputy Peraza followed the department's protocols when he arrested Jennifer in the face of overwhelming evidence that he had the wrong person.

212.    BSO's Internal Affairs Division reviewed the individual Defendants' actions and confirmed that the officers followed BSO protocols and did not violate any BSO policies or practices when they detained Jennifer for over 75 hours without confirming that she was the subject of an outstanding warrant.

### INJURY TO PLAINTIFF

213.    Defendants' actions deprived Jennifer of her liberty interest in being free from unreasonable and non-arbitrary detentions.

214.    Defendants' actions from December 24 through December 27, 2022, directly harmed Jennifer, and she continues to experience harm to this day.

215.    As a direct result of Defendants' actions, Jennifer has suffered and will continue to suffer extreme and severe mental and emotional trauma, post-traumatic stress, anxiety, sleeplessness, behavioral changes, mental anguish, deterioration of her health, pecuniary loss, and loss of enjoyment of life.  Jennifer has had to go to therapy to help her process the trauma and limit its continuing effects on her life.

216.    As a direct result of Defendants' actions, Jennifer also suffered pecuniary loss, including but not limited to the costs incurred trying to free her from her wrongful detention by Defendants, such as the costs of Kyle and Mark's hotel in Fort Lauderdale, rental cars, flights, and attorneys' fees.  Jennifer has also incurred pecuniary loss due to the considerable time, effort, and money she's had to spend trying to clear her name due to Defendants' mistaken insistence that she was the subject of a warrant for someone else's arrest.  Defendants' actions, for instance, caused Harris County to treat Jennifer as the defendant in Jennifer Delcarmen Heath's case, and caused the federal Transportation

Security Administration to temporarily detain Jennifer for additional security measures each time she flies.  To this day, she still can't fly without going through extra security checks.

## CAUSES OF ACTION
### CLAIM I
### Unreasonable Seizure in Violation of the Fourth Amendment
### Against All Individual Defendants

217.    Jennifer incorporates by reference ¶¶ 1 – 217.

218.    The Fourth Amendment to the U.S. Constitution, as incorporated against the states by the Fourteenth Amendment, protects individuals' rights to be secure in their persons, property, and effects, and to be free from unreasonable searches and seizures.

219.    Under the Fourth Amendment, seizures generally must be supported by probable cause.

220.    Jennifer was subject to a seizure from the time BSO officers surrounded her on the cruise ship and she was not free to decline to engage with those officials, refuse their demands, or otherwise terminate the encounter.

221.    This unreasonable detention continued until her release from BSO's detention facilities over 75 hours later.

222.    There was no probable cause to support BSO officers' seizure of Jennifer. Neither Harris County nor Broward County had a valid warrant for Jennifer's arrest.  Yet, BSO officers arrested Jennifer anyway and detained her for over 75 hours without a reasonable basis to do so.

223.    The seizure of Jennifer was unreasonable from its inception and became more unreasonable as the seizure continued.

224.    While a warrant is a judicial determination that there is probable cause to arrest the subject of the warrant, a warrant for one person does not give police probable cause to arrest another person—even if they have the same or a similar name.

225.    When officers have reason to believe that the person they plan to arrest is not subject to the arrest warrant they plan to execute, they must either stop to confirm that they have the correct person or abandon the arrest.

226.    BSO officers should have realized there was no warrant for Jennifer's arrest before they decided to board Jennifer's cruise ship on the morning of Christmas Eve 2022.

227.    All the information that officers needed to verify Jennifer was not the subject of the warrant was readily available.

228.    Between the information on the warrant and information available in the National Crime Information Center database, BSO officers should have been able to readily identify at least 10 discrepancies between Jennifer and the subject of the Harris County warrant:

    a.  The warrant was for Jennifer Delcarmen Heath, while Jennifer's name is Jennifer Heath Box.  Heath is Jennifer's maiden (now middle) name—not her surname.

    b.  Delcarmen Heath's birthdate is April 7, 1997, while Jennifer's date of birth is January 28, 1974, making her 23 years older than the subject of the warrant.

c. Delcarmen Heath's address was an apartment on Corder Street in Houston, Texas, while Jennifer's address was in a different county, on Blue Pearl Drive in Richmond, Texas, where she had lived for the prior nine years.

d. Delcarmen Heath had a Texas driver's license number ending in 819, while Jennifer's driver's license number ends in 610.

e. Delcarmen Heath had a different social security number than Jennifer.

f. Delcarmen Heath had a different FBI number than Jennifer.

g. Delcarmen Heath had brown eyes while Jennifer's eyes are blue-gray.

h. Delcarmen Heath was 4'11" while Jennifer is 5'4".

i. Delcarmen Heath had medium-toned skin while Jennifer's skin is fair.

j. Delcarmen Heath had black hair while Jennifer's hair is red.

229. These 10 discrepancies between Jennifer and Delcarmen Heath should have caused any reasonable officer to realize that the warrant was not for Jennifer and there was no probable cause to support Jennifer's arrest.

230. The decision by Deputies Peraza and Jean to arrest Jennifer anyway was unreasonable, in violation of the Fourth Amendment.

231. At the very least, these 10 discrepancies would have caused any reasonable officer to do basic due diligence to confirm that the person they planned to arrest was actually subject to the arrest warrant.

232. It should have been easy for BSO to confirm its error because the warrant sought Jennifer Delcarmen Heath's arrest for endangering two dependent children under 15—her toddlers, ages one and three—while Jennifer's children were all adults—ages 29,

32

20, and 18—when the warrant issued.  In fact, Jennifer's oldest daughter is older than the subject of the warrant.

233.    The complainant in Delcarmen Heath's case was her husband Christopher Heath.  Jennifer's husband is Kyle Box.

234.    Jennifer also had a different Harris County System Person Number than Delcarmen Heath, something BSO could have confirmed by contacting Harris County.

235.    But over the course of Jennifer's six-day cruise, no one at BSO bothered to look closely enough at the available information to spot the discrepancies and discover their mistake.

236.    Defendants' decision to arrest Jennifer only became more unreasonable when ship security brought Jennifer over to BSO officers.

237.    Any reasonable officer would have realized when they arrived on the cruise ship, just by looking at Jennifer, that there were at least five obvious physical differences between Jennifer and the subject of the Texas warrant:

      a.  Jennifer was 48 years old while the warrant sought someone who was 27 years old.

      b.  Jennifer is 5'4" while the warrant sought someone who was 4'11".

      c.  Jennifer has fair skin while the warrant sought someone with medium-toned skin.

      d.  Jennifer has light blue-gray eyes while the warrant sought someone with brown eyes.

      e.  Jennifer has red hair while the warrant sought someone with black hair.

238.    Yet, Defendants ignored these five physical indicia as well.

239.    Between these five physical differences and all the biographical differences listed in ¶¶ 229, 233 – 235 BSO officers ignored more than a dozen easily identifiable facts that would have caused any reasonable officer to realize that Jennifer was not the subject of the Texas warrant.

240.    Any reasonable officer would have realized, upon Jennifer's initial detainment, that there was no probable cause for her arrest.  The decision of Deputies Peraza and Jean to arrest Jennifer anyway violated the Fourth Amendment.

241.    Once Deputies Peraza and Jean had Jennifer safely detained in the back of Deputy Peraza's vehicle, and Deputy Peraza double checked that Heath was Jennifer's middle name and that her birthdate, eye color, and skin color did not match the warrant, any further reliance on the warrant became an unreasonable basis for Jennifer's continued detention.

242.    Any reasonable officer would have spotted these discrepancies and asked for assistance from dispatch, Harris County, or the Houston Police Department.

243.    Had Deputies Peraza and Jean spotted these obvious discrepancies, they would have discovered their mistake before bringing Jennifer to Broward County Jail.

244.    Jennifer's continued detention past this point was unreasonable, in violation of the Fourth Amendment.

245.    Jennifer's continued detention became even more unreasonable as Deputy Peraza drove Jennifer to Broward County Jail.

246.   Jennifer told Deputy Peraza that her children were adults by the time the warrant issued and that she had been pulled over in Texas and those officers found no warrants attached to her license.

247.   Had Deputy Peraza acted reasonably, this new information would have further caused him to realize there was no probable cause to support Jennifer's arrest.

248.   Then, when Deputy Peraza and officials at the Broward County Jail scanned Jennifer's driver's license, the scan confirmed that Jennifer had no outstanding warrants.

249.   Any reasonable officer would have stopped booking Jennifer for an outstanding warrant upon learning that she had no outstanding warrant.

250.   Then, when Deputies Peraza and Doe filled out the forms for Jennifer's arrest and listed her biographical information that did not match the warrant, any reasonable officer would have caught the discrepancy and realized that she was not the subject of the warrant.

251.   Then, when Deputy Peraza identified that Jennifer had tattoos that did not match the suspect, any reasonable officer would have realized that this fact—combined with the dozen others—confirmed that Jennifer was not the subject of the arrest warrant.

252.   Had Deputies Peraza and Doe behaved like reasonable officers at this point, Jennifer would have been free by mid-afternoon on December 24, in time to still make it home for Christmas.

253.   Instead, Deputies Peraza and Doe disregarded more overwhelming evidence that Jennifer was not subject to an arrest warrant.

254.    Deputies Peraza and Doe's decision to book Jennifer into jail anyway was unreasonable, in violation of the Fourth Amendment.

255.    Then, when BSO officers took Jennifer's fingerprints, any reasonable officer would have checked to see if her fingerprints matched those of the suspect—particularly given all the other reasons BSO officers had to doubt Jennifer was the subject of the warrant.

256.    Faced with credible information that BSO jailed the wrong person, any reasonable officer would have taken additional steps to verify Jennifer's identity, such as checking her fingerprints.

257.    Then, when Mark called BSO on December 25 and explained the mistake to Specialist Thorpe and when he called back on December 26 to tell Specialist Thorpe that Houston police had accidentally attached Jennifer's DMV photo to the suspect's warrant, any reasonable officer would have realized that there was no basis to continue detaining Jennifer for two more days.

258.    The decision to continue detaining Jennifer anyway was unreasonable, in violation of the Fourth Amendment.

259.    Then, when Officer Doe came to Jennifer's cell on December 26 and told her that BSO was aware that she was not the subject of the arrest warrant on which they were detaining her, any reasonable officer would have stopped detaining Jennifer.

260.    Officers' decision to continue to detain Jennifer—even after they knew she was not the subject of an arrest warrant—was unreasonable, in violation of the Fourth Amendment.

261.    Despite all the evidence that there was no probable cause for Jennifer's arrest or continued detention, BSO officers detained Jennifer for 75 hours without any reasonable basis to do so.

262.    As a direct and proximate cause of Defendants' unconstitutional seizure of Jennifer, she suffered the harm outlined in ¶¶ 216 – 217.

263.    Punitive damages are justified because Defendants' conduct was motivated by evil motive or intent, or it involved reckless or callous indifference to Jennifer's federally protected rights.

### CLAIM II
### Arbitrary Deprivation of Liberty in Violation of the Fourteenth Amendment Against All Individual Defendants

264.    Jennifer incorporates by reference ¶¶ 1 – 217.

265.    The Due Process Clause of the Fourteenth Amendment protects against government action that arbitrarily deprives someone of their life, liberty, or property.

266.    The right to be free from physical restraint is a core liberty interest protected by the Due Process Clause.  Any physical detention must serve a legitimate governmental interest.

267.    Defendants' arbitrary physical detention of Jennifer violated her right to due process.

268.    Defendants detained Jennifer in jail for over three days because she shared two-thirds of a name with someone who had an outstanding warrant.

269.    It's arbitrary to detain someone because they have the same name as a criminal suspect—let alone when they only share part of the suspect's name.

270.   Jennifer was the most common female name in the 1970s and the second most common name in the 1980s.

271.   There are at least 1,857 people in this country named Jennifer Heath, and likely more.

272.   There are at least 160 people living in Texas named Jennifer Heath.

273.   It is arbitrary for law enforcement to execute a warrant—particularly an out-of-state warrant—on anyone who shares a name with the suspect.

274.   Defendants' failure to verify that Jennifer was the Jennifer Heath described in the warrant caused her arbitrary arrest and detention.

275.   Such an arbitrary detention was possible only because Defendants' identifying, arresting, verifying, and booking procedures did not adequately safeguard against mistaken deprivations of liberty.

276.   Jennifer's arbitrary detention lasted even longer because Defendants lacked procedures to adequately ensure that an innocent person is freed once jail officials realize they have the wrong person.

277.   BSO officers knew or should have known that they had the wrong person based on information that was readily available to them.

278.   Even after Jennifer and then Kyle and Mark pointed out to BSO officers that they had the wrong person, they ignored all exculpatory evidence and continued to detain the wrong person anyway.

279.   Defendants' indifference to Jennifer's innocence violated her right to due process.

280.    As a direct and proximate cause of Defendants' unconstitutional seizure of Jennifer, she suffered the harm outlined in ¶¶ 216 – 217.

281.    Punitive damages are justified because Defendants' conduct was motivated by evil motive or intent, or it involved reckless or callous indifference to Jennifer's federally protected rights.

## CLAIM III
### Unreasonable Seizure in Violation of the Fourth Amendment
### Against Broward County

282.    Jennifer incorporates by reference ¶¶ 1 – 217.

283.    Through the individual Defendants' actions and Broward County's subsequent ratification of those actions, the County adopted and enforced an official policy, practice, or custom of unreasonable seizures in violation of the Fourth Amendment.

284.    Officers working for Broward County arrested Jennifer based on someone else's warrant because they did not take reasonable steps to confirm her identity before arresting her and placing her in jail for three days.

285.    Jennifer's arrest and continued detention were unreasonable, in violation of the Fourth Amendment.

286.    After Jennifer's release from her mistaken arrest and detention, BSO's Internal Affairs Department reviewed the individual Defendants' conduct and confirmed that they acted in accordance with Broward County's policies, practices, and procedures when they seized Jennifer without probable cause for 75 hours.

287. In doing so, Broward County ratified that the individual Defendants' unconstitutional conduct was consistent with Broward County's policies, practices and customs.

288. Broward County's policies, procedures, and customs allow BSO officers to arrest innocent people and lock them in jail without taking reasonable steps to verify that the arrestee is subject to a warrant.

289. Broward County knew or should have known that its policies, procedures, and customs cause BSO to mistakenly arrest and jail innocent people due to BSO's failure to verify an arrestee's identity during booking procedures.

290. It should be obvious that an arrestee will not always be the person who an arresting officer thinks they are, and that adequate booking procedures are necessary to confirm an arrestee's identity before placing them in jail.

291. The probability of mistaken-identity detentions is heightened when Broward County enforces out-of-jurisdiction arrest warrants, something that happens regularly in Broward County—especially given Broward County's willingness to enforce the outstanding warrants of people who take cruises out of Port Everglades.

292. In at least two other publicly reported incidents—those involving Paola Londono and Leonardo Silva Oliverio—Broward County has mistakenly arrested and jailed an innocent person based on the same failures that occurred in this case.

293. These past unreasonable detentions put Broward County officials on notice that their policies failed to adequately safeguard the constitutional rights of people arrested because they share a name with a criminal suspect.

294.    Despite these past mistaken detentions, Broward County failed to adequately train its officers or implement new policies, practices, or customs to ensure that BSO staff verify the identities of arrestees before or during the booking process.

295.    Although BSO staff must fill out booking forms with an arrestee's identifying information as part of the booking process, Broward County's policies do not require BSO staff to cross-reference that identifying information against an arrest warrant to ensure BSO staff is booking the correct person into jail.

296.    Although BSO staff takes the fingerprints of arrestees as part of the booking process, Broward County's policies do not require BSO staff to use those fingerprints to verify the arrestee's identity before booking them into jail.

297.    Nor do Broward County's policies require BSO staff to take any additional steps to verify an arrestee's identity when BSO staff has reason to believe that an arrestee is not the subject of an arrest warrant.

298.    Broward County's policies do not, for instance, require BSO staff to stop the booking process when an arrestee's identifying information does not match the identifying information listed on the warrant on which the person was arrested.

299.    Nor do Broward County's policies even require BSO staff to inform a person purporting to be the victim of mistaken identity that they must wait until they're already in jail and then use a kiosk to report BSO's mistake.

300.    If Broward County had adequate policies, practices, or customs in place to prevent detentions based on mistaken identity, BSO staff would not have seized Jennifer and continued to detain her for 75 hours.

301. As a direct and proximate cause of Broward County's failure to implement adequate policies, practices, or customs, Jennifer suffered the harm outlined in ¶¶ 216 – 217.

302. Punitive damages are justified because Defendants' conduct was motivated by evil motive or intent, or it involved reckless or callous indifference to Jennifer's federally protected rights.

### CLAIM IV
### Arbitrary Deprivation of Liberty in Violation of the Fourteenth Amendment Against Broward County

303. Jennifer incorporates by reference ¶¶ 1 – 217.

304. Through the individual Defendants' actions and Broward County's subsequent ratification of those actions, the County adopted and enforced an official policy, practice, or custom of arbitrarily depriving persons of their liberty in violation of the Fourteenth Amendments.

305. Defendants detained Jennifer in jail for over three days because she shared two-thirds of a name with someone who had an outstanding warrant.

306. Jennifer was the most common female name in the 1970s and the second most common name in the 1980s.

307. There are at least 1,857 people in this country named Jennifer Heath, and likely more.

308. There are at least 160 people living in Texas named Jennifer Heath.

309. It is arbitrary for law enforcement to execute a warrant—particularly an out-of-jurisdiction warrant—on anyone who shares a name with the suspect.

310.   It's even more arbitrary to do so based on two-thirds of a person's name.

311.   Putting Jennifer in jail because a small portion of her identifying information matched that of someone with an out-of-state warrant arbitrarily deprived Jennifer of a liberty interest protected by the Due Process Clause.

312.   After Jennifer's release from her mistaken arrest and detention, BSO's Internal Affairs Department reviewed the individual Defendants' conduct and confirmed that they acted in accordance with Broward County's policies, practices, and procedures when they deprived Jennifer of her liberty arbitrarily for 75 hours.

313.   In doing so, Broward County ratified that the individual Defendants' unconstitutional conduct was consistent with Broward County's policies, practices and customs.

314.   Broward County's policies, procedures, and customs allow BSO officers to lock people in jail based on their name alone—without taking reasonable steps to verify that the person is the subject of an arrest warrant.

315.   Broward County knew or should have known that its policies, procedures, and customs cause BSO to arbitrarily jail innocent people due to the lack of any policy requiring that BSO verify an arrestee's identity before or during booking procedures.

316.   It should be obvious that an arrestee will not always be the person who an arresting officer thinks they are, and that adequate booking procedures are necessary to confirm an arrestee's identity before placing them in jail.

317.   The probability of mistaken-identity detentions is heightened when Broward County enforces out-of-jurisdiction arrest warrants, something that happens regularly in

Broward County—especially given Broward County's willingness to enforce the outstanding warrants of people who take cruises out of Port Everglades.

318.   In at least two other publicly reported incidents—those involving Paola Londono and Leonardo Silva Oliverio—Broward County has mistakenly jailed an innocent person based on the same failures that occurred in this case.

319.   These past arbitrary detentions put Broward County officials on notice that their policies failed to adequately safeguard the constitutional rights of people arrested because they share a name with a criminal suspect.

320.   Despite this history of jailing innocent people who share a name with someone with an outstanding warrant, Broward County failed to adequately train its officers or implement new policies, practices, or customs ensuring that BSO staff verify the identities of arrestees during the booking process.

321.   Although BSO staff takes an arrestee's fingerprints as part of the booking process, Broward County's policies do not require BSO staff to use those fingerprints to verify the arrestee's identity.

322.   Nor do Broward County's policies require BSO staff to take any additional steps to verify the identity of someone arrested on a warrant from another jurisdiction—even when there is reason to believe that BSO has mistaken their identity.

323.   Broward County's policies do not, for instance, require BSO staff to stop the booking process when an arrestee's identifying information does not match the identifying information listed on the warrant on which the person was arrested.

324.   Nor do Broward County's policies even require BSO staff to inform a person purporting to be the victim of mistaken identity that they must wait until they're already in jail and then use a kiosk to report BSO's mistake.

325.   If Broward County had adequate training, policies, practices, or customs in place to prevent detentions based on mistaken identity, BSO staff would not have booked Jennifer in jail and detained her for three days.

326.   As a direct and proximate cause of Broward County's failure to implement adequate policies, practices, or customs, Jennifer suffered the harm outlined in ¶¶ 216 – 217.

327.   Punitive damages are justified because Defendants' conduct was motivated by evil motive or intent, or it involved reckless or callous indifference to Jennifer's federally protected rights.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court provide the following relief:

A.     A declaration that Defendants violated Plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures when they arrested and detained Plaintiff on someone else's warrant despite overwhelming evidence that they had the wrong person.

B.     A declaration that Defendants violated Plaintiff's right to be free from arbitrary detentions guaranteed by the Fourteenth Amendment's Due Process Clause by detaining Plaintiff because someone with a similar name had an outstanding warrant.

C.      A declaration that Broward County's policies, practices, or customs, violated Jennifer's federally protected right to be free from unreasonable seizure in violation of the Fourth Amendment.

D.      A declaration that Broward County's municipal policies, practices, or customs, violated Jennifer's federally protected right to be free from arbitrary deprivations of liberty in violation of the Fourteenth Amendment.

E.      An award of compensatory damages for each of the claims for relief in an amount to be proved at trial.

F.      An award of punitive damages because Defendants were motivated by evil motive or intent or acted with reckless or callous indifference to Plaintiff's federally protected rights.

G.      An award of nominal damages as an acknowledgement of the violation of Plaintiff's constitutional rights.

H.      An award of Plaintiff's costs and expenses, together with reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, plus any other costs and fees that are legal and equitable.

I.      Further legal or equitable relief as this court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a jury trial on all triable issues.

Date: September 19, 2024                    Respectfully,

                                            */s/Justin M. Pearson*
                                            Justin M. Pearson (FL Bar No. 597791)
                                            Katrin Marquez (FL Bar No. 1024765)
                                            Email: jpearson@ij.org; kmarquez@ij.org

46

INSTITUTE FOR JUSTICE
2 South Biscayne Blvd., Suite 3180
Miami, FL 33131
Tel: (305) 721-1600

Jared A. McClain* (DC Bar No. 1720062)
Bobbi M. Taylor* (NJ Bar No. 435162023)
Email: jmcclain@ij.org; btaylor@ij.org
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320

*Attorneys for Plaintiff Jennifer Heath Box*
*Applications for admission *pro hac vice*
 forthcoming