UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-61734-CIV-DAMIAN/Valle

JENNIFER HEATH BOX,

      Plaintiff,

v.

BROWARD COUNTY SHERIFF
GREGORY TONY, *et al.*,

      Defendants.

_____/

## ORDER ON DEFENDANTS' JOINT MOTION TO DISMISS [ECF NO. 31]

**THIS CAUSE** came before the Court upon Defendants, Broward County Sheriff Gregory Tony ("the Sheriff"), Deputy Peter Peraza, Deputy Monica Jean, Deputy Jasmine Hines, and Deputy Anthony Thorpe (collectively, "the Deputies," and with the Sheriff, "Defendants"), Joint Motion to Dismiss [ECF No. 31 (the "Motion")], filed February 10, 2025.

THE COURT has reviewed the Motion and the Response [ECF No. 43] thereto (no Reply was filed), the pertinent portions of the record, and the applicable law and is otherwise fully advised. For the reasons set forth below, this Court finds that the Motion is due to be granted in part.

## I.      BACKGROUND[1]

As alleged in the Amended Complaint, on Christmas Eve 2022, Plaintiff, Jennifer Heath Box ("Plaintiff"), was disembarking at Port Everglades following a cruise with her

---

[1] At this stage, the Court accepts the well-pled allegations in the Complaint as true and construes them in the light most favorable to Plaintiff. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

family when a team of Broward County Sheriff's Office ("BSO") deputies met her at the exit of the ship to arrest her pursuant to an outstanding warrant from Harris County, Texas. *See* Am. Compl. ¶¶ 26-28 [ECF No. 25]. As it turns out, the warrant was for a different person, not Plaintiff, and it took Defendants three days to confirm the mistake and release Plaintiff, who spent three days, including Christmas, in jail. *See id.* ¶ 1.

### A.  The Information On The Warrant.

Plaintiff points out ten discrepancies between herself and the individual identified in the warrant ("Suspect"):

| Discrepancy | Suspect | Plaintiff |
|---|---|---|
| **Name** | Jennifer Delcarmen Heath | Jennifer Heath Box |
| **Date of Birth** | April 7, 1997 | January 28, 1974 |
| **Address** | Corder Street in Houston, Texas | Blue Pearl Drive in Richmond, Texas |
| **Eye Color** | Brown | Blue-Gray |
| **Height** | 4'11" | 5'4" |
| **Hair Color** | Black | Red |
| **Skin Tone** | Medium | Fair |
| **Driver's License No.** | Not a match | |
| **Social Security No.** | Not a match | |
| **FBI No.** | Not a match | |

*Id.* ¶ 32. Plaintiff alleges that all the above information could have been confirmed from a review of the warrant and the National Crime Information Center Database ("NCIC"), both

of which were readily available to the Defendants when they arrested her and at all times after. *Id.* Even though the Defendants had the information that the Suspect may be on the cruise for six days before they arrested Plaintiff, Plaintiff alleges that they did not verify any of the above information before they arrested her. *Id.* ¶ 38.

### B. The Christmas Eve Arrest.

A team of eight BSO deputies was waiting for Plaintiff when she disembarked from her cruise on the morning of December 24, 2022, to arrest her pursuant to an outstanding warrant out of Texas, based on charges for endangering a dependent child under the age of 15. *Id.* ¶¶ 26-28, 40. When the arresting deputies detained Plaintiff, she gave them her passport and driver's license, and those deputies passed a copy of the warrant to each other to review the personal information of the Suspect identified in the warrant. *Id.* ¶¶ 49, 52. Deputy Peraza and Deputy Jean were present at the arrest, and they tried to settle Plaintiff's and her husband's protests by assuring them that Plaintiff's identify would be verified. *Id.* ¶¶ 45-46, 51, 59.

However, the Deputies never verified that Plaintiff was the Suspect. *Id.* ¶ 60. Plaintiff alleges that while she was in the back of Deputy Peraza's vehicle, Deputy Peraza sat at his computer and asked for Plaintiff's full name and eye color, presumably to ascertain if they matched the Suspect's; he even remarked that Plaintiff had fair skin (not medium-toned, like the Suspect) but continued to ignore the mounting evidence that Plaintiff was not the Suspect. *Id.* ¶¶ 65-70, 72. As Deputy Peraza was driving Plaintiff to the jail, he told her that the warrant matched her date of birth and married name (Box), which was untrue. *Id.* ¶ 79. Plaintiff alleges that Deputy Peraza did not confirm through any legitimate process or basis that Plaintiff was the Suspect and that BSO has no policy in place for officers to take steps to confirm an

3

arrestee's identity when there is reason to believe that a warrant is being executed on the wrong person. *Id.* ¶¶ 87-88.

### C. BSO's Booking Process.

When Deputy Peraza delivered Plaintiff to the jail, the booking officer, Deputy Hines, scanned Plaintiff's driver's license and informed Deputy Peraza that there was no warrant for her arrest in their system. *Id.* ¶ 95. Plaintiff alleges that Deputy Peraza convinced Deputy Hines, in the face of the evidence to the contrary, that Plaintiff was the Suspect because their names were similar and the Suspect's mugshot appeared to look like Plaintiff. *Id.* ¶¶ 98-100. Plaintiff further alleges that BSO does not have a policy in place that requires a booking officer to stop the booking process for individuals arrested on warrants when a search of an individual's driver's license shows no outstanding warrants. *Id.* ¶ 102.

According to the allegations in the Amended Complaint, the arrest affidavit that Deputy Peraza filled out confirms that he knew Plaintiff's information did not match the Suspect's because he included Plaintiff's correct information after having read the warrant several times during Plaintiff's arrest. *Id.* ¶¶ 105. While Deputy Hines also filled out booking forms that included Plaintiff's correct information (which contradicted the information in the warrant), the BSO does not have any policy requiring booking officers to confirm that information from a booking form matches a suspect's information. *Id.* ¶¶ 108, 114.

As part of the booking process, Plaintiff was fingerprinted. *Id.* ¶ 116. Her fingerprints did not match the Suspect's, which BSO would have known if it required its officers to use fingerprints to confirm that an arrestee is indeed the suspect identified on a warrant. *Id.* ¶¶ 117-20.

### D. Plaintiff's Detention In Jail Over Christmas And Plaintiff's Relatives' Efforts To Get Her Identify Verified.

Plaintiff was detained in jail through Christmas Day. She alleges that she experienced what is more-or-less typical of any person arrested and detained in jail, including body cavity searches, exposure to violence and unceasing loud noises that made sleep impossible, interactions with condescending and uncaring guards (who, male and female, also watched her shower), enduring unbearably cold temperatures, and so on. *Id.* ¶¶ 135-46. After her arraignment on Christmas Day, BSO transferred Plaintiff to Paul Rein Detention Center, where the conditions were similar to those at the first detention center except that the guards also allegedly played death-metal music throughout the cells at all hours. *Id.* ¶¶ 148, 152-54, 157-58.

Plaintiff alleges that while she was being booked at the Broward County Jail on Christmas Eve, her husband, Kyle, and brother, Mark (who happens to be a law enforcement officer in Georgia), worked tirelessly to convince anyone at BSO to verify Plaintiff's identity. *Id.* ¶¶ 160-61. The first deputy with whom Kyle and Mark spoke informed them that Plaintiff was the proper person identified in the warrant and that she would be booked into the Broward County Jail, where she would await extradition to Texas. *Id.* ¶ 165. The day after Christmas, Kyle hired an attorney in Texas who learned from a law enforcement deputy in Harris County that the Suspect and Plaintiff had different FBI numbers and dates of birth. *Id.* ¶¶ 171-73. And, as the Harris County deputy dug further, she realized that someone with the Houston Police Department had mistakenly attached Plaintiff's driver's license photo to the arrest warrant for the Suspect. *Id.* Plaintiff's brother, Mark, and her attorney immediately started calling Harris County and Broward County law enforcement to try to correct the

mistake. *Id.* ¶ 174. Mark tried several numbers for the BSO, including the BSO Warrants Division, BSO Main Headquarters, and BSO Main Detention, until he finally reached Deputy Thorpe, who oversees Central Intake at the Broward County Jail. *Id.* ¶ 175.

Plaintiff alleges that Mark informed Deputy Thorpe of the new evidence he learned from the deputy in Harris County about the incorrect DMV photograph, but Deputy Thorpe insisted that he could not do anything because it was Plaintiff's responsibility to alert BSO of the issue. *Id.* ¶¶ 176-77. Mark then contacted officials in Harris County, who told Mark that BSO needed to send over the warrant and Plaintiff's fingerprints to Harris County so that the data could be compared to the Suspect's. *Id.* ¶ 178. When Mark asked Deputy Thorpe to send over the warrant and Plaintiff's fingerprints for verification, Deputy Thorpe initially refused. *Id.* ¶ 179. After about a dozen phone calls from Mark, Deputy Thorpe finally agreed to contact Harris County sometime on December 26. *Id.* ¶ 183.

Meanwhile, on the afternoon of December 26, a male guard informed Plaintiff that BSO knew she was not the Suspect but that, despite BSO's mistake, the only way for her to go free was for Harris County officials to come get her or for the correct Suspect to be arrested. *Id.* ¶¶ 186-87. That same day, at around 8:30 p.m., Plaintiff went to the jail kiosk and filed a complaint, requesting that BSO compare her fingerprints to the Suspect's fingerprints, even though BSO already knew Plaintiff was not the Suspect. *Id.* ¶¶ 195-96. The following day, at around 9:50 a.m., after over 75 hours of detention, BSO finally released Plaintiff. *Id.* ¶ 199. When BSO released Plaintiff, jail personnel told her, "It happens." *Id.* ¶ 206. By the time Plaintiff returned to her home in Seattle, she missed the opportunity to say goodbye to her servicemember son, who reported for duty after Christmas. Plaintiff alleges that as of the date

the Amended Complaint was filed, December 18, 2024, she still had not seen her son in person. *Id.* ¶¶ 201-04.

### E. Post-Release Investigation And Discovery Of Prior Incidents.

After BSO released Plaintiff, she alleges that she tried to make sense of how the mistaken identity arrest occurred. Plaintiff alleges that BSO maintains publicly that Deputy Peraza followed the Department's protocols when he arrested Plaintiff, despite the mountain of evidence that she was not the Suspect. *Id.* ¶¶ 210. And BSO's Internal Affairs Division reviewed the Deputies' actions and confirmed that they had followed BSO protocols and did not violate any BSO policies or practices when they detained Plaintiff without ever verifying if she was, indeed, the Suspect. *Id.* ¶ 211.

Plaintiff also alleges that despite prior, similar incidents, BSO did not take measures to improve its policies. She alleges that two similar false arrests on a different person's warrant, one in 2010 and one in 2022, put BSO on notice that it needed to improve its booking procedures to match fingerprints for individuals arrested on warrants. *Id.* ¶¶ 121-32.

Meanwhile, after speaking with two officers at the Houston Police Department, Plaintiff learned that if BSO had simply called the Houston Police at the time of her arrest, they would have recognized the error and told BSO not to proceed with the arrest from the start. *Id.* ¶ 208.

## II.   PROCEDURAL HISTORY

On September 19, 2024, Plaintiff filed the original complaint against Broward County, Deputy Peraza, Deputy Jean, a Jane Doe booking officer, a Corrections Specialist f/n/u Thorpe, and a John Doe corrections officer, alleging violations of the Fourth and Fourteenth

Amendments to the United States Constitution arising from the alleged unlawful detention. *See generally* ECF No. 1.

A month later, on December 18, 2024, Plaintiff filed an Amended Complaint in which she added the Sheriff as a defendant and included the names of some of the previously unknown defendants. *See generally* Am. Compl. Plaintiff asserts four causes of action in the Amended Complaint: (I) unreasonable search and seizure under the Fourth Amendment against the Deputies; (II) arbitrary deprivation of liberty under the Fourteenth Amendment against the Deputies; (III) unreasonable search and seizure under the Fourth Amendment against the Sheriff; and (IV) arbitrary deprivation of liberty under the Fourteenth Amendment against the Sheriff. *Id.*

Defendants responded by filing the Motion now before the Court. *See generally* Mot. In the Motion, the Deputies argue that Counts I and II should be dismissed because they are entitled to qualified immunity. The Deputies also argue that these counts fail to state a claim for any constitutional violation because they had a valid warrant that included Plaintiff's photograph and a name similar to Plaintiff's. *See id.* at 2, 7-8. The Sheriff argues that Counts III and IV should be dismissed because the Amended Complaint does not sufficiently describe a policy or custom that would expose the Sheriff to liability. *See id.* at 9-11. Specific to the arbitrary deprivation claims (Counts II and IV), the Defendants argue that a brightline rule from the Eleventh Circuit, in *Sosa v. Martin County*, 57 F.4th 1297 (11th Cir. 2023), compels dismissal because a three-day mistaken detention does not rise to an arbitrary deprivation as a matter of law. *See id.* at 6-7.

In her Response, Plaintiff argues that qualified immunity does not protect the Deputies because their mistake was not reasonable. Plaintiff points to case law in support of her

argument that arresting the wrong person, even with a similar name and photo, is sufficient to state a claim for an unreasonable seizure under the Fourth Amendment when there is sufficient contradictory evidence that would cause a reasonable officer to suspect that additional identity verification is needed. *See* Resp. at 9-14. With regard to the Sheriff's policy or custom argument, Plaintiff argues that a pattern of multiple factually similar mistaken identity arrests that received media exposure put BSO on notice that its arrest and/or booking procedures were inadequate when making arrests pursuant to warrants where there are discrepancies between the individual described on the warrant and the person being arrested. *See id.* at 15-16. Plaintiff urges this Court to infer an unlawful practice and custom from BSO's own statements that the Deputies followed proper procedures, where those procedures have resulted in the same sort of mistaken arrests by BSO over more than the past decade. *See id.* at 16. Alternatively, Plaintiff responds that the Sheriff could still be liable if the policymaker was deliberately indifferent to the risk of mistaken-identity arrests, for which Plaintiff argues she has included sufficient factual support. *See id.* at 17-18. While Plaintiff provides a response to Defendants' argument about the *Sosa* brightline rule foreclosing the arbitrary deprivation claims, she acknowledges that this Court is bound by the Eleventh Circuit decision and that she only wishes to preserve her challenge for appellate purposes.

Defendants did not file a Reply, and the time to do so has expired.[2] The Motion is therefore ripe for adjudication.

---

[2] By not filing a Reply that addresses Plaintiff's arguments in her Response, Defendants have effectively conceded any counterargument to the specific points raised by Plaintiff. *See GolTV, Inc. v. Fox Spots Latin Am. Ltd.*, 277 F. Supp. 3d 1301, 1311 n.7 (S.D. Fla. 2017) (Altonaga, J.) ("When a party fails to respond to an argument or address a claim in a responsive brief, such argument or claim can be deemed abandoned.").

### III.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim" showing the pleader is entitled to relief. The complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). Rule 12(b)(6) also provides that a defendant may move to dismiss a complaint that does not satisfy the applicable pleading requirements for "failure to state a claim upon which relief can be granted." Under Rule 12(b)(6), a motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556).

In considering a Rule 12(b)(6) motion to dismiss, the court's review is generally "limited to the four corners of the complaint." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) (quoting *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002)). The Court must review the complaint in the light most favorable to the plaintiff, and it must generally accept the plaintiff's well-pleaded facts as true. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). However, pleadings that "are no more than conclusions[ ] are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Granting a motion to dismiss is appropriate when it is demonstrated beyond a doubt the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Reeves v. DSI Sec. Servs.*, 331 F. App'x 659, 661 (11th Cir. 2009).

10

## IV.   DISCUSSION

### A.   *Unreasonable Seizure Under Section 1983 (Counts I and III).*

In Counts I and II, Plaintiff asserts a claim for unreasonable seizure against the Deputies and the Sheriff, respectively.

### 1.   Count I – Unreasonable Seizure Claim Against The Deputies.

The Fourth Amendment protects against unreasonable searches and seizures. A police officer violates the Fourth Amendment if the officer arrests a person without probable cause. *See Madiwale v. Savaiko*, 117 F.3d 1321, 1324 (11th Cir. 1997) ("There is no question that an arrest without probable cause to believe a crime has been committed violates the Fourth Amendment."). "[A]n officer ordinarily does not violate the Fourth Amendment when he executes a facially valid arrest warrant[.]" *Williams v. Aguirre*, 965 F. 3d 1147, 1162 (11th Cir. 2020). Where, as here, the police have a valid warrant to arrest someone but mistakenly arrest the wrong person, the Eleventh Circuit employs a "reasonable mistake" standard to determine whether there was probable cause to make the arrest. *Rodriguez v. Farrell*, 280 F.3d 1341, 1346-47 (11th Cir. 2002) (citing *Hill v. Calif.*, 401 U.S. 797, 802 (1971)). The Eleventh Circuit further instructs courts to "evaluate the totality of the circumstances surrounding the arrest to determine its reasonableness." *Id.* at 1347.

In *Rodriguez*, relied on by the Defendants, the Eleventh Circuit held that a police officer made a reasonable mistake when he arrested the wrong man pursuant to a warrant. 280 F.3d at 1349. In reaching that conclusion, the Eleventh Circuit noted that the arrestee's "identifying information was identical to the information listed in [the] warrant in four critical aspects: same name, same sex, same age, and same race." *Id.* at 1347. The court also noted that "[s]ignificant other information was similar[,]" such as their social security numbers, their

11

addresses, their state of birth, and the number and location of most tattoos. *Id.* The only "material difference" the *Rodriguez* court identified was that the man who was arrested was 5'11" while the suspect described in the warrant was 5'6" tall. *Id.* The Eleventh Circuit concluded that the mistake in that case was reasonable when viewing these similarities and the single material difference against the totality of the circumstances. *Id.* at 1347. Notably, in that case, the officers were out in the field rather than in a police station, it was after midnight, and the officers had just found methamphetamine in a container from the vehicle in which the arrestee was one of two occupants. *Id.*

In her Response, Plaintiff points out that the circumstances in the *Rodriguez* case are markedly different from those presented here. Plaintiff cites to two cases in support of her argument that the Deputies' mistakes leading to her arrest were unreasonable. First, in *Tillman v. Coley*, the Eleventh Circuit held that, despite a suspect's and arrestee's names and physical characteristics generally matching, a mistaken identity arrest was not reasonable where the person being arrested was forty-one years old, whereas the suspect was twenty-four, and the arresting officer had three months between when he received the initial report and when he made the arrest during which he could have allayed any concerns about mistaken identity. 886 F.2d 317, 318, 320-21 (11th Cir. 1989); *id.* at 322 (Fay, J., dissenting) (noting that the suspect's and arrestee's physical descriptions matched). In the second case relied on by Plaintiff, *Cannon v. Macon County*, the court analyzed a Fourteenth Amendment claim for arbitrary deprivation of due process, rather than a Fourth Amendment claim for unreasonable seizure, and there was no discussion of whether the misidentification by the officer was a reasonable mistake. *See generally* 1 F.3d 1558 (11th Cir. 1993). Therefore, the *Cannon* decision has little bearing on the issue of reasonableness now before this Court.

12

Other courts in this District have considered the issue of whether mistaken identities by law enforcement were reasonable. In *Rodriguez v. Gomez*, the court denied a motion to dismiss a plaintiff's claim that, in arresting the wrong person, a Miami-Dade police officer violated the plaintiff's Fourth Amendment rights. 656 F. Supp. 3d 1343 (S.D. Fla. 2022) (Moore, J.). In *Gomez*, the plaintiff voluntarily went to the police station for them to run a pre-employment background check, and the plaintiff gave the officer his driver's license, which included his date of birth and residential address. *Id.* at 1348. The officer arrested the plaintiff pursuant to a warrant for a man who had the same first and last name but had a different address and birthdate. *Id.* at 1349. The district court noted that the officer ignored the plaintiff's requests to speak to a supervisor or to have his identity verified and also noted that during the entire exchange, the officer was holding the plaintiff's driver's license that contained all the contradictory information. *Id.* The court also pointed out that there were no circumstances upon which the officer would be given latitude, like acting in the heat of the moment, such that a misidentification might be considered reasonable. *Id.* ("At the time of the incident, Defendant was not stopped on the side of the road or in pursuit in the field, she was sitting at her desk. Defendant's safety as an officer of the law was not in jeopardy. She had ample opportunity to look at Plaintiff's driver's license and recognize that it was not consistent with the warrant and citations.").

Similarly, in *Oliveria v. Coconut Greek*, another court in this District denied a police officer's motion to dismiss a Fourth Amendment claim based on a misidentification. No. 23-cv-60378 (S.D. Fla. Sept. 11, 2023) (Dimitrouleas, J.) (ECF No. 42). In *Oliveria*, the plaintiff was arrested in the afternoon pursuant to a warrant for a person with the same name, but who had a different date of birth, a three-inch difference in height, a forty-pound difference in

13

weight, and the warrant had a photograph of a different man. *Id.* at 23. The officer also had a copy of the fugitive's purported driver's license information, which, due to an administrative error improperly linking the plaintiff's driver's license to the warrant, made it appear that the plaintiff's driver's license information matched the fugitive's. *Id.* When the plaintiff told the officer that he was not on probation and that the warrant could not be for him, the officer contacted the sheriff's office and realized that the photograph on the warrant did not match the one on the driver's license. *Id.* at 24. However, the officer refused to use a fingerprint scanner or any other rapid verification program to determine if the plaintiff was the fugitive and instead told the plaintiff that "it would get sorted out at the jail." *Id.* (quotation in original). The court held that under the totality of the circumstances, the officer was not entitled to dismissal based on a reasonable mistake. *Id.*

Here, taking the factual allegations in the Amended Complaint as true and viewing them in the light most favorable to the Plaintiff, the Deputies have not shown their mistake was reasonable. Unlike the circumstances in the Eleventh Circuit's *Rodriguez* decision, the totality of the circumstances presented here, in which there were numerous discrepancies between the Suspect's information and the Plaintiff's, and where the officers were not in exigent circumstances when they made the arrest but, instead, had plenty of time to figure out their mistake, does not lead to the conclusion that the mistake was reasonable such that dismissal of the Fourth Amendment claim would be appropriate at this time. The facts of this case are more similar to those presented in *Oliveria* and *Gomez*, where motions to dismiss were denied because there were observable differences between the individual and the person described in the warrant and there was plenty of time for officers to verify the identity of the person being arrested but the officers ignored red flags and arrested the person anyways. Like

the courts in *Oliveria* and *Gomez*, this Court finds the Deputies' Motion to Dismiss is due to be denied as to Count I insofar as it is based on a claim of reasonable mistake.

2.    Qualified Immunity For The Deputies.

Qualified immunity also does not compel dismissal at this time. "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003) (internal quotations omitted). Because qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), issues of qualified immunity must be resolved "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). Accordingly, it is appropriate for this Court to address the defense of qualified immunity at the motion to dismiss stage to determine whether the complaint "fails to allege the violation of a clearly established constitutional right." *Gonzalez*, 325 F.3d at 1233 (quoting *Williams v. Ala. State Univ.*, 102 F.3d 1179, 1182 (11th Cir. 1997)).

In analyzing the applicability of qualified immunity, a court must first determine whether the defendant was acting within his or her discretionary authority. *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1136 (11th Cir. 2007). Plaintiff does not dispute that the Deputies were, at all times, acting within the scope of their discretionary authority. Once it is determined the officer was acting within his or her discretionary authority, the burden shifts to the plaintiff to establish that the officer is not entitled to qualified immunity. *Id.* In meeting this burden, a plaintiff must demonstrate that (1) the facts alleged make out a violation of a constitutional right and (2) the right at issue was clearly established at the time of the violation.

15

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). As explained in Part IV-A-1, *supra*, this Court finds that the facts alleged in the Amended Complaint make out a claim of a Fourth Amendment violation, so the only remaining question is whether the right at issue was clearly established.

"A right is clearly established if, in light of preexisting law, the unlawfulness of the official's conduct is 'apparent.'" *Cooper v. Dillon*, 403 F.3d 1208, 1220 (11th Cir. 2005). Existing law must give an officer a "fair warning" that his or her conduct is unlawful. *See id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). A plaintiff may demonstrate that an officer violated clearly established law "(1) by pointing to a materially similar decision of the Supreme Court, of [the Eleventh Circuit], or of the supreme court of the state in which the case arose; (2) by establishing that 'a broader, clearly established principle should control the novel facts' of the case; or (3) by convincing us that the case is one of those rare ones that 'fits within the exception of conduct which so obviously violates th[e] constitution that prior case law is unnecessary.'" *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022) (quoting *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005)).

This Court finds that Eleventh Circuit case law provides several materially similar decisions that would provide the Deputies a fair warning that their conduct was unlawful. In *Tillman v. Coley*, the Eleventh Circuit held that qualified immunity did not protect an officer who knew of a substantial age discrepancy but arrested the wrong person anyway pursuant to a lawful warrant. 886 F.2d 317, 321 (11th Cir. 1989) ("A reasonable police officer would have been sufficiently concerned by the age discrepancy of a generation to make further investigation as to [the identity of the person being arrested]."). The Eleventh Circuit also made clear that this sort of mistaken identity arrest was unlawful in *Cannon v. Macon County*,

16

where the plaintiff was four inches shorter, twelve years younger, and had different color eyes and a different middle name from the fugitive. *See* 1 F.3d 1558, 1560, 1565 (11th Cir. 1993). Because the Amended Complaint states a Fourth Amendment violation against the Deputies and Eleventh Circuit precedent put them on notice of the unlawfulness of their conduct, the Deputies are not entitled to dismissal of Count I on qualified immunity grounds.

3.   Count III – Unreasonable Seizure Claim Against The Sheriff.

In Count III, Plaintiff alleges the Sheriff violated Plaintiff's rights under the Fourth Amendment through various inadequate policies, practices, and customs that caused the violation of her constitutional rights. *See* Am. Compl. ¶¶ 282-303. The Sheriff avers that Count III should be dismissed because Plaintiff includes "insufficient allegations of other incidents upon which a 'custom' could be established." Mot. at 10. Plaintiff responds that not only has she sufficiently alleged a policy or custom, but she also states a claim for policymaker liability for the Sheriff's inadequate training under a deliberate indifference theory. Resp. at 14.

Initially, the undersigned finds that *respondeat superior* liability is unavailable under § 1983 as to a municipal policymaker, like the Sheriff; rather, Plaintiff must identify a government policy or custom that caused the injury. *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329 (11th Cir. 2003). Put differently, a government entity may be liable in a § 1983 action "only where the [government entity] itself causes the constitutional violation at issue." *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1116 (11th Cir. 2005) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989))).

Thus, to sate a claim for a § 1983 violation against a government entity, a plaintiff must establish that an official policy or custom of the government entity was the "moving force" behind the alleged constitutional deprivation. *See Monell v. Dep't of Soc. Servs. of City of*

17

*N.Y.*, 436 U.S. 658, 693-95 (1978). "Because a [defendant] rarely will have an officially adopted policy of permitting a particular constitutional violation," most plaintiffs must show the existence of a custom or practice permitting the alleged constitutional violation. *Grech*, 335 F.3d at 1330 (quoting *Harris*, 489 U.S. at 389). The plaintiff must also demonstrate a direct causal link between the policy or custom and the constitutional deprivation. *Young v. City of Augusta*, 59 F.3d 1160, 1171 (11th Cir. 1995).

Even where there is not a specific municipal procedure identified, a "failure to adequately train municipal employees constitutes an actionable policy or custom for § 1983 purposes . . . where the failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." *Cook*, 402 F.3d at 1116 (internal citation omitted). In other words, a municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a "custom or policy" if the municipality either (1) tacitly authorizes these actions or (2) displays deliberate indifference towards the police misconduct. *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987).

The Sheriff argues that "mere allegations of wrongdoing" do not establish a custom or policy and that "a plaintiff must show multiple similar, past, meritorious complaints against a police force to prove a custom[.]" Mot. at 10. Plaintiff responds that she did not allege "mere allegations of wrongdoing" but, instead, that she has sufficiently alleged "a pattern of meritorious complaints" that would have put the Sheriff "on notice that [his] policies would cause mistaken-identity detentions because those policies had already done so in two similar cases." Resp. at 15, 17.

In her Response, Plaintiff points to five specific policies that, she claims, sufficiently state a claim for a custom or policy tacitly authorized by the Sheriff: (1) officers are not

required to cross reference booking documents against the arrest warrant to ensure the correct person is booked into jail; (2) officers who take fingerprints of arrestees are not required to verify those fingerprints against the individual on a warrant; (3) officers are not required to take any additional steps to verify an arrestee's identity when an officer has reason to believe the arrestee is not the subject on the warrant; (4) officers are not required to stop the booking process when an arrestee's identifying information does not match the information on a warrant; and (5) officers are not required to inform a person purporting to be the victim of mistaken identity how they can report BSO's mistake. *See* Am. Compl. ¶¶ 296-300.

Initially, the undersigned notes that the examples identified by Plaintiff are not policies, but, instead, they are examples of the absence of policies. The Eleventh Circuit has expressed doubt concerning whether such an absence of policies falls within the *Monell* standard. *See Brooks*, 813 F.2d at 1194 n.4 ("We assume arguendo that the failure to adopt a specific procedure can fall within the *Monell* definition of custom or policy. We, nevertheless, have doubts as to the validity of this proposition."). In any event, Plaintiff's Amended Complaint alleges the Sheriff's failure to train demonstrates deliberate indifference toward the prospect of police misconduct, and, therefore, Plaintiff still may meet her burden at the motion to dismiss stage to state a claim against the Sheriff.

While the briefing by both sides delves into the specific inquiry of how many similar, prior incidents must have occurred to establish a custom or policy, that is a reductive view of the operative rule. *See Brown v. City of Margate*, 842 F. Supp. 515, 518 (S.D. Fla. 1993) (Hoeveler, J.) ("Plaintiff's burden was to show that a pervasive policy of deliberate indifference to [police misconduct] existed, not that any specific number of incidents occurred. Put differently, a smaller number of incidents where the investigation and resulting

disciplinary actions were inadequate may be more indicative of a pattern than a larger number of incidents where the department fully and satisfactorily addressed the matter and responded appropriately."), *aff'd*, 56 F.3d 1390 (11th Cir. 1995). The relevance of presenting prior incidents is not to satisfy some brightline rule of how many incidents are required or at what recency, but merely to confirm that a policy or practice is not alleged on the basis of an isolated incident and instead upon circumstances from which the policymaker would have had constructive knowledge of a prior incident or incidents. *See Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986) ("The evidence revealed several incidents involving the use of unreasonable and excessive force by police officers. Therefore, the city had knowledge of improper police conduct, but failed to take proper remedial action. The continued failure of the city to prevent known constitutional violations by its police force is precisely the type of informal policy or custom that is actionable under section 1983.").

The Court notes that in *Brown v. Margate*, a district court (in a decision affirmed by the Eleventh Circuit) did not disturb a jury verdict awarding damages in a *Monell* claim for excessive force because it held that only two prior incidents, considered in conjunction with other evidence indicating a lack of proper training and inadequate investigations, could support an argument that law enforcement acted in reliance of an unconstitutional policy or custom. 842 F. Supp. at 517.

Here, Plaintiff alleges two remarkably similar mistaken arrests that, taken as true, should have put the Sheriff on notice that remedial action was needed to prevent unlawful arrests when the information on a warrant does not match the arrestee's personal information. Specifically, in 2010, BSO arrested Paola Londono as she disembarked from a cruise ship pursuant to a warrant for a different person who was seven years older and five inches shorter.

20

Am. Compl. ¶¶ 122-23. Like the instant case, the officers failed to verify that Londono was the fugitive by comparing her personal information or her fingerprints to those of the fugitive. *Id.* ¶¶ 122-23. Londono was held in jail for two days before a judge in her hometown intervened. *Id.* ¶ 125. And in January 2022, BSO booked a man named Leonardo Silva Oliveria pursuant to an arrest warrant, despite the fact that he was a different age and had different physical characteristics, such as weight and tattoos, from those of the fugitive. *Id.* ¶¶ 128-29. Because BSO did not verify Oliveria's identity using his personal information or fingerprints, he was held for five days pursuant to a different person's warrant. *Id.* ¶¶ 130-31. Plaintiff alleges that following each of these similar incidents, BSO did not adopt adequate policies to prevent mistaken arrests like the one Plaintiff endured. *See id.* ¶¶ 126, 132, 209.

These two examples are sufficient to get Plaintiff over the hurdle of showing prior, similar incidents. The inference that the Sheriff had notice of the improper police conduct (here, arresting the wrong person despite glaring red flags indicating a case of mistaken identity) and failed to take remedial action is bolstered by the allegation that BSO's Internal Affairs Division reviewed Plaintiff's incident and confirmed that the Deputies followed all BSO protocols and did not violate any BSO policies. *See id.* ¶¶ 210-11. Further, Plaintiff alleges a direct causal link between the Sheriff's policies/failure to train and her constitutional deprivation. *See id.* ¶¶ 115, 119, 133.

Thus, Plaintiff's Amended Complaint contains sufficient factual allegations to state a § 1983 claim against the Sheriff, and the Motion to Dismiss will be denied as to Count III.

21

**B.      *Arbitrary Deprivation In Violation Of Due Process Rights Under Section 1983 (Counts II and IV).***

As noted above, Defendants argue that the Fourteenth Amendment claims for arbitrary deprivation of rights should be dismissed pursuant to *Sosa v. Martin County,* 57 F.4th 1297 (11th Cir. 2023). Mot. 4-7. In *Sosa*, the Eleventh Circuit held that a three-day mistaken detention did not, as a matter of law, state an arbitrary deprivation claim under the Fourteenth Amendment. 57 F.4th at 1301. Plaintiff responds that *Sosa* improperly extended *Baker v. McCollan*, 443 U.S. 137 (1979), to the context of mistaken arrests caused by a failure to verify basic facts from the warrant. Resp. at 19. This Court is bound by the clear holding in *Sosa*, which refers to "only two criteria: the validity of [the underlying] arrest warrant and the length of the detention." *Sosa*, 57 F.4th at 1300 (citing *Baker*, 443 U.S. at 143-44). Here, as in *Sosa*, the underlying warrant was lawful, and the detention did not meaningfully exceed three days.[3] Thus, pursuant to binding precedent from the Eleventh Circuit in *Sosa*, Plaintiff's arbitrary deprivations claims must be dismissed. As such, Defendants' Motion is due to be granted as to Counts II and IV.

## V.      CONCLUSION

Accordingly, for the reasons set forth above, it is

**ORDERED AND ADJUDGED** as follows:

1.      Defendants' Joint Motion to Dismiss [**ECF No. 31**] is **GRANTED IN PART AND DENIED IN PART**.

---

[3] This Court notes that, according to the allegations in the Amended Complaint, Plaintiff was arrested shortly before 7:00 a.m. on December 24 and released shortly before 10:00 a.m. on December 27 (three days is 72 hours, whereas Plaintiff was confined for 75 hours). Thus, her detention may have exceeded three days by three hours.

2.      Counts II and IV are **DISMISSED WITH PREJUDICE**.

3.      Defendant shall file an Answer as to the remaining Counts **within fourteen**

**(14) days of the date of this Order**.

    **DONE AND ORDERED** in Chambers in the Southern District of Florida, this 3rd

day of September, 2025.

 

 

 

**MELISSA DAMIAN**
**UNITED STATES DISTRICT JUDGE**

cc:     Counsel of Record